UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK COLEMAN,

                    Plaintiff,

                                     Civil Action No. 2:19-cv-13494

v.                              Honorable Terrence G. Berg

                                     Magistrate Judge David R. Grand

TORI MOHLMAN, et al.,

                    Defendants.

_____/

## REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART DEFENDANTS' MOTION TO DISMISS (ECF No. 13)

Plaintiff Mark Coleman ("Coleman"), an incarcerated person, brings this action pursuant to 42 U.S.C. § 1983, alleging violations of his First Amendment rights. (ECF No. 1.) Before the Court is a motion to dismiss filed by the defendants – Tori Mohlman ("Mohlman"), Cindy Olmstead ("Olmstead"), and Mark Holey ("Holey") (collectively, the "Defendants") on March 12, 2020. (ECF No. 13.) Coleman filed a response, and Defendants filed a reply. (ECF Nos. 19, 23.)

Generally, the Court will not hold a hearing on a motion in a civil case in which a party is in custody. *See* E.D. Mich. L.R. 7.1.(f). Here, the Court finds that the facts and legal issues are adequately presented in the briefs and on the record, and it declines to order a hearing at this time.

## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' motion to dismiss **(ECF No. 13)** be **GRANTED IN PART AND DENIED IN PART.**

## II.  REPORT

### A.  The Relevant Facts[1]

This is a *pro se* civil rights action brought under 42 U.S.C. § 1983 by Coleman, who is currently a prisoner of the Michigan Department of Corrections ("MDOC") at the Carson City Correctional Facility.  During the relevant period, Coleman was lodged at the G. Robert Cotton Correctional Facility ("JCF").  (ECF No. 1, PageID.2.)  Coleman alleges that the Michigan Braille Transcribing Fund ("MBTF") is "an independent private entity" that operates out of JCF, engaging inmates to "transcrib[e] reading materials for the blind," and that he has worked for MBTF for more than 20 out of the last 27 years.  (*Id.*)  Coleman's claims in this action arise out of interactions he had with certain of MBTF's civilian staff.

On February 20, 2018, Coleman filed a hostile work environment complaint with MBTF's Executive Board of Directors.  (ECF No. 23, PageID.334, 348-51.)  Olmstead is CEO/Director of MBTF, and around mid-2018, she hired Mohlman (who Coleman claims is Olmstead's daughter) to serve as her Administrative Assistant.  Coleman alleges that on two separate occasions Mohlman yelled at him about his employment responsibilities.  (*Id.* at PageID.334-35.)  On October 2, 2018, Coleman filed a written complaint with Olmstead about Mohlman's alleged harassment.  (ECF No. 1, PageID.2; ECF No. 23, PageID.353-55.)  Coleman alleges that about one week later, Olmstead met with him, but declined to take any action regarding his complaint.  (*Id.*)

---

[1] As Defendants correctly note, Coleman's response brief contained little legal argument, and was more akin to a motion for leave to amend, as he made additional factual allegations that were not in his complaint.  Defendants did not object to the Court considering those additional allegations, and instead argued that even taking those allegations into account, they were still entitled to a dismissal of Coleman's complaint.  (ECF No. 19, PageID.322.)  Accordingly, the Court culls Coleman's salient factual allegations from his complaint as well as his response to Defendants' motion to dismiss.

In December 2018, Coleman wrote to an attorney who is representing a former inmate in another Eastern District of Michigan civil action against Olmstead (and others), *Madrid v. King, et al.*, E.D.M.I. Case No. 2:17-cv-11266.  Coleman alleges that on February 26, 2019, Mohlman blocked him from certain production databases at work that were critical to carry out the functions of his position.  (ECF No. 23, PageID.335-36.)  After raising the issue with Olmstead, Olmstead informed Coleman that the files were being transferred to other employees.  (*Id*. at PageID.336.)  As a result, Coleman submitted a request for reassignment to another position within MBTF.  (*Id.*)  On February 27, 2019, Olmstead informed Coleman that his request would be honored.  (*Id.*)

On March 25, 2019, Coleman received a Prisoner Program and Work Assignment Evaluation, a report mandated by MDOC.  (*Id.*)  The evaluation, which appears to have been prepared by both Olmstead and Holey (MBTF's Production Manager), stated,

> Mr. Coleman does an excellent job for our team and if I am to suggest anything, I would remind him to be cognizant of timelines and sometimes, his soft skills when communicating.  He has an excellent work ethic and goes above and beyond without fail.  Mr. Coleman is a valued member of the MBTF team.[2]

(ECF No. 23, PageID.336-37, 357.)

On April 25, 2019, Detroit News Reporter James Dickson ("Dickson") visited MBTF to interview inmates, including Coleman.  (ECF No. 23, PageID.337.)  Towards the end of Coleman and Dickson's conversation, Coleman advised Dickson that should Dickson want to talk further about MBTF he could email Coleman through Jpay.  (*Id.*)  Coleman alleges that Mohlman interrupted the conversation and told Dickson that any discussion with Coleman must be cleared with MBTF first.  (*Id.*)  Coleman responded, stating that no clearance is required.  (*Id.* at 338.)

---

[2] Given the glowing nature of this evaluation, Coleman's characterization of it as retaliatory for his "filing complaints and affidavits" makes no sense.  (ECF No. 1, PageID.3.)

The next day, April 26, 2019, Coleman alleges that he asked Mohlman for a document he needed to complete an assignment.  (*Id.*; *Id.*; ECF No. 1, PageID.4.)  Coleman alleges that Mohlman began yelling at him and responded, "No, I am not giving them to you.  I put them on [Olmstead]'s desk."  (*Id.*; ECF No. 1, PageID.4.)  Coleman responded by asking Mohlman to take the documents he had been working on and to provide them to Olmstead.  (ECF No. 23, PageID.338.)  He admits also saying, "I'm tired of your attitude and abuse all the time."  (ECF No. 1, PageID.4; ECF No. 23, PageID.373-75.)  Shortly thereafter, Holey told Coleman that he had to leave for the day.  (ECF No. 23, PageID.338.)  Coleman was "laid in" (temporarily removed from work) from April 26, 2019 until May 2, 2019.  (ECF No. 1, PageID.4.)  However, Coleman admits that he was paid for the days he did not work, and that he was transferred to the job he had requested.  (ECF No. 23, PageID.339, 363.)

On April 26, 2019, Coleman filed a grievance with MDOC against Mohlman, Holey and Olmstead.  (Grievance # JCF.19.04.0791.17A)  (*Id.*; ECF No. 23, PageID.339, 359-62.)  MDOC denied this grievance on June 6, 2019, because Coleman "reutrned [sic] to work in a position he prferred [sic] over the last one he held and lost no pay."  (ECF No. 23, PageID.363.)  On June 14, 2019 Coleman appealed this decision (*Id.* at PageID.364).  MDOC denied this appeal on July 2, 2019 (*Id.* at PageID.365).  Coleman subsequently appealed this decision on or around August 2, 2019 (*Id.* at PageID.366-67).  MDOC also denied that appeal on August 19, 2019 (*Id.* at PageID.368).

On May 2, 2019, Coleman was called back to work with MBTF and was issued a Prisoner Employee Counseling and/or Warning Notice ("Warning Notice") regarding the April 26, 2019 interaction with Mohlman and Holey.  (ECF No. 1, PageID.4-5; ECF No. 23, PageID.372-5.)  But Coleman admits that this document merely warned him that if he received three such "warnings,"

it "will mean dismissal from assignment." (ECF No. 1, PageID.5.) Though he made no mention of it in his complaint, in his response brief, Coleman alleges that in conjunction with this Warning Notice, MBTF held what Coleman alleges was its first ever disciplinary proceeding, conducted by Olmstead, Holey and an MDOC Correctional Officer. (ECF No. 23, PageID.339.) During this hearing, Coleman alleges he was not permitted to make a statement, provide witnesses or enter a defense. (*Id.*) MBTF then reassigned Coleman to the position he had previously requested. (*Id.* at PageID.336.)

Coleman alleges that on May 9, 2019, he received the following Jpay email from Dickson that Dickson had sent a few days earlier:

> . . . I'm writing because I learned that the very next day after we met, you were laid in from the program and have been kicked out of it. MDOC says it had nothing to do with our discussion, that there had been issues. I re-listened to the interview yesterday and have a tough time seeing that. You spoke with great reverence for the program and how it allows you to give back. You'd been there 25 years. That doesn't strike me as something someone would part with lightly. What's your side of the story on the separation? And what are you doing now for work? Do you have any recourse at all to try to get the job back?

(ECF No. 1, PageID.5; ECF No. 23, PageID.388.)

Coleman alleges that he attempted to respond by e-mail, but "observed he had been blocked from responding to [Dickson]." (ECF No. 23, PageID.339-40.) Coleman blames Defendants, alleging that they "asked some unknown individual to prevent [him] from speaking with the Reporter James Dickson." (*Id.*, PageID.340-41; *see also id.*, PageID.340 ("Defendants, collectively, conspired with unknown prison officials to have his communications with Reporter James Dickson blocked.") He claims they did this because "they did not want the press to know about the abusive conditions of employment within [MBTF] and their mistreatment of its convict staff." (*Id.*, PageID. 341.)

Coleman filed some sort of internal "complaint" about the block of his Jpay account.  (ECF No.1, PageID.5; ECF No. 23, PageID.340.)  MDOC conducted an investigation into the block, confirmed the block had been imposed with respect to Dickson, and advised Coleman that Jpay had since removed the block.  (*Id.*)  However, MDOC would not reveal the identity of the individual who placed the block.  (*Id.*)  Though not entirely clear, it appears Coleman was able to mail a letter to Dickson on May 16, 2019.  (ECF No. 23, PageID.340.)

On May 6, 2019, Coleman filed another grievance with MDOC in response to the May 2, 2019 disciplinary proceeding at MBTF.  (Grievance # JCF.2019.05.0844.02Z)  (ECF No. 23, PageID.339, 370.)  MDOC denied this grievance on June 5, 2019 because Coleman was paid for the days he did not work while "laid in."  (ECF No. 23, PageID.371.) On June 14, 2019, Coleman appealed this decision.  (*Id.* at PageID.377.)  MDOC denied the appeal on July 26, 2019.  (*Id.*).  Coleman again appealed on August 12, 2019, but the MDOC denied it on September 16, 2019.  (*Id.* at PageID.378.)

On November 25, 2019, Coleman filed his complaint in this Court, asserting a First Amendment retaliation claim in which he alleges that the Defendants retaliated against him following his complaints and grievances.  (ECF No. 1.)  Defendants have moved to dismiss Coleman's complaint, and that motion is fully briefed.  (ECF Nos. 13, 19, 23.)

### B.  Standard of Review

Defendants "seek to dismiss [Coleman's] Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6)."  (ECF No. 13, PageID.51.)  A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests a complaint's legal sufficiency.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556.  Put another way, the complaint's allegations "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original) (citing *Twombly*, 550 U.S. at 555-56).

In deciding whether a plaintiff has set forth a "plausible" claim, the Court must accept the factual allegations in the complaint as true.  *Id.*; *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  That tenant, however, "is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," to prevent a complaint from being dismissed on grounds that it fails to comport sufficiently with basic pleading requirements.  *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 555; *Howard v. City of Girard Ohio*, 346 F. App'x 49, 51 (6th Cir. 2009).  Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Pleadings filed by *pro se* litigants are entitled to a more liberal reading than would be afforded to formal pleadings drafted by lawyers.  *Thomas v. Eby*, 481 F.3d 434, 437 (6th Cir. 2007).  Nonetheless, "[t]he leniency granted to pro se [litigants] ... is not boundless," *Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004), and their "complaints still must plead sufficient facts

to show a redressable legal wrong has been committed." *Baker v. Salvation Army*, No. 09-11424, 2011 WL 1233200, at *3 (E.D. Mich. Mar. 30, 2011).

Defendants have, in certain limited respects, gone beyond the pleadings to support their instant motion. For example, Defendants offer Olmstead's affidavit in which she makes certain factual representations relevant to Coleman's claims, such as asserting that he was "laid in" because he had "refus[ed] to do his work." (ECF No. 13-12, PageID.288.) The Court has discretion as to whether it will consider such extrinsic evidence presented in connection with a motion to dismiss, though if it does, it must treat the motion as one for summary judgment and give the opposing party an opportunity to address or further develop the evidence. *See e.g., Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 255 F.R.D. 443, 446 (W.D. Mich. 2009) (". . . if the Court considers an affidavit attached to a motion to dismiss, the Court must convert the motion into one for summary judgment."). See also, Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."). Here, the Court finds that it may resolve the issues raised in Defendants' motion to dismiss without considering any extrinsic evidence.

### C.  Analysis

Coleman argues that Defendants retaliated against him, in violation of his First Amendment rights, in a few respects following his complaints and grievances. First, Coleman claims that he was improperly "laid in" from work for about a week. Second, he alleges he was issued the Warning Notice and had to attend a related disciplinary proceeding. Third, he claims that Defendants instructed the MDOC to block his Jpay account from responding to an e-mail from the

Detroit News Reporter, Dickson.  In their instant motion, Defendants argue that Coleman's Section 1983 claims fail for a number of reasons.  First, they claim that they are not "state actors," and thus cannot have committed a constitutional violation against him.  Second, they claim Coleman's allegations do not rise to the level of a constitutional violation.  And, third, they claim they are entitled to qualified immunity.

i.     *Defendants' Status as State Actors*

To prevail on a claim brought pursuant to Section 1983 alleging a constitutional violation, "a plaintiff must demonstrate that the conduct which caused his or her alleged injury is 'fairly attributable to the State' . . ."  []  Conduct which deprives a party of a federally protected right can be said to be fairly attributable to the state when: (1) the deprivation is caused by the exercise of a state-created right or privilege, by a state-imposed rule of conduct, or by a person for whom the state is responsible, and (2) the party charged with the deprivation may be fairly described as a state actor."  *Baytops v. Slominski*, No. 20-CV-11630, 2020 WL 4505899, at *2 (E.D. Mich. Aug. 5, 2020) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).

Defendants argue that they are private individuals, and therefore Coleman cannot establish that they are "state actors" for purposes of Section 1983 liability.  (ECF No. 13, PageID.53-54.)  In response, Coleman argues that the Court should follow the holding in *Madrid v. King,* No. 17-11266, 2018 U.S. Dist. LEXIS 27643 (E.D. Mich. Jan. 30, 2018) – the same Eastern District of Michigan case in which Coleman provided an affidavit.  In *Madrid*, the court held that the plaintiff had adequately pled that both Olmstead and Holey were state actors.  *Id.* at *13.

Private entities may be considered "state actors" if they exercise power prescribed by state law and if they "are clothed with the authority of state law."  *United States v. Classic*, 313 U.S. 299, 326 (1941).  The Supreme Court has set forth a two-prong test for determining whether the

actions of a private party causing the deprivation of a federal right are attributable to the state. *Phelps v. Dunn*, 965 F.2d 93, 102 (6th Cir. Ky. May 28, 1992) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).  "First, the deprivation must be caused by the exercise of some right or privilege created by the state or by a rule of conduct imposed by the state or by a person for whom the state is responsible."  *Id.*  Then, "the party charged with the deprivation must be a person who may fairly be said to be a state actor."  *Id.*  An individual is deemed a state actor if "he is a state official**,** *because he has acted together with or has obtained significant aid from state officials*, or because his conduct is otherwise chargeable to the state."  *Id.* (emphasis added)

To determine when actions of a private entity are fairly attributable to the state, three tests have been advanced: the public function test, the state compulsion test, and the nexus test. *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. Ohio March 4, 1992).  The public function test requires that plaintiff demonstrate that the private entity exercises powers which are traditionally exclusively reserved to the state.  *Id.*  The state compulsion test provides that a state exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state.  *Id.*  And finally, the nexus test requires a sufficiently close relationship between the state and the private actor such that the action taken may be attributed to the state.  *Id.*

Following *Madrid*, the Court finds that Coleman has sufficiently alleged Defendants' state actor status to overcome their instant motion.  MBTF operates solely within two MDOC facilities, JCF being one of them, as a prisoner work program.  (ECF No. 13, PageID.54.)  While Defendants argue that this fact alone does not make them state actors, this is not the only relationship between MBTF and MDOC.  (*Id.*)  MBTF is subject to the MDOC policy directives and is required to complete MDOC forms and reports such as the Work Assignment Evaluation and Warning Notice

and its related affidavits.  (*Id.* at PageID.55-56.)  Further, Olmstead's ability to "lay in" Coleman and other inmates is not solely "a function of a normal, operational business," but is inextricably intertwined with inmate control within MDOC.  (*Id.* at PageID.55.)  It is precisely because of this overlapping relationship that the Court is also not persuaded by Defendants' argument that because Jpay is controlled by MDOC, MBTF cannot be deemed a state actor.  (*Id.* at PageID.57.)  And, Coleman specifically alleges that the Defendants instructed the MDOC to block Coleman's ability to respond to Dickson's e-mail.

The privilege to conduct business within MDOC facilities and obtain inmate workers is created and maintained by MDOC, a state entity.  Any deprivation of rights that occurs within MBTF is therefore, by nature, the exercise of this state privilege.  Beyond being literally housed within a state agency, MBTF and its non-inmate employees "act[] together with or [have] obtained significant aid from state officials."  *Phelps*, 965 F.2d at 102.  Subject to MDOC's Policy Directives, MDOC exercises such power and provides such significant encouragement over MBTF that any "choice" of the private actor is deemed to be that of the state.

Coleman points to the court's holding in *Madrid* on practically the same arguments made by Defendants here.  In *Madrid*, the plaintiff was also employed by MBTF within JCF.  The plaintiff allegedly experienced sexual harassment and made verbal as well as formal complaints and alleged he was issued a misconduct citation in retaliation.  *Madrid v. King*, No. 17-11266, 2018 U.S. Dist. LEXIS 27643 at *2-3 (E.D. Mich. Jan. 30, 2018).  On this misconduct citation the plaintiff was initially found guilty and lost three days of privileges.  (*Id.* at *3-4.)  On rehearing, the plaintiff was found not guilty.  (*Id.*)  Shortly thereafter, he was transferred and had his over 8-year employment with MBTF terminated.  (*Id.* at *4.)  Furthermore, an investigation found sufficient evidence to support the claims of sexual harassment.  (*Id.* at *5.)  In a Report and

11

Recommendation upheld by the district judge, the *Madrid* court held that the plaintiff adequately

pled that both Olmstead and Holey were state actors.  (*Id.* at *13.)  Because of the analogous, and

almost parallel factual allegations, lodged against the same defendants, the Court finds the

reasoning in *Madrid* persuasive, and despite Coleman raising it front and center in his response

brief, Defendants did not address it in their reply.  Accordingly, Defendants are not entitled to

dismissal based on their argument that they are not state actors.

ii.     *Coleman's First Amendment Retaliation Claim*

"[A]s a general matter the First Amendment prohibits government officials from subjecting

an individual to retaliatory actions" for engaging in protected speech.  *Nieves v. Bartlett*, 139 S.

Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U. S. 250, 256 (2006)).  "An inmate has

an undisputed First Amendment right to file grievances against prison officials on his own behalf."

*Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000).  A First Amendment retaliation claim has

three elements:

> (1) the plaintiff engaged in protected conduct;
> (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and
> (3) there is a causal connection between elements one and two -- that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

There are limitations, however, for inmates on what qualifies as protected conduct.  First,

an inmate's right to file grievances against prison officials on his own behalf is protected only if

the grievances are not frivolous.  *Herron*, 203 F.3d at 415.  Second, prison regulations that impinge

on inmates' constitutional rights are valid if they reasonably relate to legitimate penological

interests.  *Thaddeus-X*, 175 F.3d at 390.  Therefore, if an inmate violates a legitimate prison

regulation, he is not engaged in protected conduct and cannot establish a First Amendment retaliation claim. *Id.* at 395.

Finally, to prove causation it is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured. *Nieves v. Bartlett*, 139 S. Ct. at 1722. The retaliatory motive must be a "but-for" cause to the adverse action. *Id.* The Sixth Circuit has held that "temporal proximity between the protected conduct and the adverse action by the state actor" may be sufficient evidence of causation. *See Paige v. Coyner*, 614 F.3d 273, 283 (6th Cir. 2010).

Defendants do not dispute that Coleman's filing of grievances and complaints with MDOC constitutes protected First Amendment conduct. (ECF No. 23, PageID.58, n. 5.) Rather, Defendants argue that Coleman's First Amendment retaliation claim fails on the second and third prongs.[3] Therefore, the Court need only address whether Coleman has pled sufficient facts to establish the plausibility: (1) that an adverse action was taken against him by Defendants, and (2) that said adverse actions were the result of protected First Amendment conduct. For the reasons set forth below, the Court finds that Coleman has pled sufficient factual allegations to state a First Amendment retaliation claim only with respect to the block of his Jpay account, and even then, only as to Defendant Mohlman.

*1. Adverse Action*

---

[3] In their reply, Defendants note that Coleman exhausted his grievances, but they then argue that he filed his present lawsuit "for the improper purpose of continuing said grievance," as if because his grievances were unsuccessful, he is precluded from bringing his claim in this Court. (ECF No. 19, PageID.323.) This argument lacks merit. Exhaustion of a grievance is a *prerequisite* to filing a complaint in court. Under the Prison Litigation Reform Act, 42 U.S.C. §1997e(a), a prisoner may not bring an action, "under [§1983] or any other Federal law," to challenge his conditions of confinement until all available administrative remedies have been exhausted. 42 U.S.C. §1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 85 (2006). Thus, while the grievance process may help to focus the issues in dispute and provide the Court with information that will aid it in determining a claim's merits, the mere fact Coleman did not obtain relief through the grievance process does not preclude him from asserting his properly-exhausted claims in this Court.

***Written Evaluation***

As noted above, *supra* at 3 n.2, Coleman first seems to allege that the written evaluation prepared by Olmstead and Holey was a retaliatory response to his complaints and an "adverse action." But given the evaluation's glowing nature, it simply cannot reasonably be characterized as such, and the Court need not accept as true Coleman's contrary legal conclusion in determining whether he has stated a claim for relief with respect to this issue. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555; *Howard*, 346 F. App'x at 51. Thus, to the extent Coleman attempts to assert a First Amendment retaliation claim based on the written evaluation, that claim should be dismissed.

***One-Week Work "Lay-In," Job Change, and Warning Notice and Related "Disciplinary" Proceeding***

Next, Coleman alleges that he was subjected to a number of adverse actions following the specific events that started on April 25, 2019.

Coleman alleges that while he was speaking with Detroit News Reporter Dickson on April 25, 2019, Mohlman "rushed" upon them and told Dickson, "you are not allowed to speak with [Coleman]." (ECF No. 23, PageID.337.) Coleman alleges that "[t]he very next day, Defendant Mohlman continued with her pattern of harassment and retaliatory behavior by withholding work product documentation . . ." (*Id.*, PageID.338.) They then had a verbal confrontation, and Coleman admits telling Mohlman, "I'm tired of your attitude and abuse all the time." (ECF No. 1, PageID.4; ECF No. 23, PageID.373-75.)

Coleman alleges that he was "laid in" from work for about a week, and then, when he returned to work, was issued the Warning Notice and faced a disciplinary proceeding regarding that Notice. (ECF No. 23, PageID.339; ECF No. 1, PageID.4-5.) Coleman also alleges that although he was transferred to the job he requested, he felt compelled to make this request because

of the way he was being treated.  Coleman argues that each of these constitute cognizable "adverse actions" sufficient to support his First Amendment retaliation claim.  The Court disagrees.

First, neither the "lay-in" or job change constitute adverse actions under the law.  Coleman admits that although he was not allowed to work for the six days in question, he was paid for those days and then was returned to work.  He argues, "Defendants seem to believe that because [he] was not fired from his job that they should not be held accountable for their abuses against him . . ."  (*Id.*, PageID.341.)  Coleman's argument lacks merit because it fails to recognize that in the Sixth Circuit, "[s]everal panels [] have determined that a suspension with pay does not constitute an adverse action" for purposes of a First Amendment retaliation claim.  *Sensabaugh v. Halliburton*, 937 F.3d 621, 629 (6th Cir. 2019) (citing *Ehrlich v. Kovack*, 710 F. App'x 646, 650 (6th Cir. 2017) and *Harris v. Detroit Pub. Schs.*, 245 F. App'x 437, 443 (6th Cir. 2007)).  Thus, Coleman's "lay-in" from work is not, as a matter of law, an "adverse action."  Nor was his switching of jobs an "adverse action"  Indeed, "in Michigan prisons, there is no right to prison employment because prison administrators have complete discretion regarding prisoner work assignments."  *Johnson v. Purdy*, No. 19-13556, 2019 WL 6912759, at *2 (E.D. Mich. Dec. 18, 2019) (citing *Dobbins v. Craycraft*, 423 F. App'x 550, 552 (6th Cir. 2011)).  Moreover, prisoners have no right to "a particular prison job."  *Jewell v. Leroux*, 20 F. App'x. 375, 377 (6th Cir. 2001).

Similarly, even if Coleman genuinely believes his behavior was entirely appropriate, merely being issued the Warning Notice and having what therefore amounted to nothing more than a meeting about it, does not, as a matter of law, constitute an "adverse action" for purposes of a First Amendment retaliation claim.  *See e.g., Melton v. United States DOL*, 373 F. App'x 572, 575 (6th Cir. 2010) (holding that a written warning by itself was not adverse action).

15

For all of these reasons, to the extent Coleman attempts to assert a First Amendment retaliation claim based on the one-week "lay-in," his changed job, or the Warning Notice and related "disciplinary" proceeding, his claim should be dismissed.

### Alleged Blocking of Correspondence with Detroit News Reporter Dickson

The final "adverse action" alleged by Coleman is the blocking of his Jpay account with respect to Detroit News Reporter Dickson.  Coleman alleges that on May 9, 2019, he received a Jpay e-mail from News reporter Dickson, and that he was unable to respond to Dickson via Jpay because Defendants "asked some unknown individual to prevent [him] from speaking with the Reporter James Dickson," *i.e.*, "to have his communications with Reporter James Dickson blocked." (ECF No. 23, PageID.340-41.)

The Court has found at least two cases in which a prisoner's similar claim was permitted to proceed beyond the earliest stages of the litigation.  In *Terry v. Calhoun County Correctional Facility*, 2012 WL 5198376, at *6 (W.D. Mich. Oct.19, 2012), the federal district court found the plaintiff inmate had sufficiently alleged that the sheriff had a policy or custom of preventing inmates from communicating with newspaper reporters, and thus allowed his First Amendment claim to proceed.  And, in *Dugan v. Jarvis*, 725 F. App'x 813, 815 (11th Cir. 2018), the trial court had allowed such a claim to proceed through the discovery stage.

At this early stage of the proceedings, the Court cannot say that the communication block alleged by Coleman – with a reporter seeking information for a potential story to be published – cannot be an adverse action for purposes of a First Amendment retaliation claim.  *Id.*  Moreover, as Coleman is a *pro se* litigant, the Court must liberally construe his allegations, *Thomas*, 481 F.3d at 437, and such a block could support a standalone First Amendment violation.  In *Hanrahan v. Mohr*, No. 2:13-CV-1212, 2017 WL 1134772, at *5 (S.D. Ohio Mar. 24, 2017), aff'd, 905 F.3d

947 (6th Cir. 2018), the court explained, "[w]hile acknowledging the limitations on inmates' constitutional rights, it also is clear that the First Amendment precludes prisons from regulating, through the grant or denial of permission for prisoners to talk with reporters, the content of speech which reaches the news media." It follows that if a prison violates the First Amendment by regulating the content of a prisoner's communication with a reporter, the wholesale blocking of that communication would also violate the First Amendment.

Accordingly, the Court finds that Coleman has sufficiently alleged an adverse action with respect to the block placed on his Jpay account to support a claim under the First Amendment.

### 2. Causal Connection and Individual Action

To proceed with his First Amendment claim, Coleman must also allege sufficient facts of causation and the related concept that in a Section 1983 case, each individual defendant can only be held responsible for his or her individual conduct. In a Section 1983 case, a plaintiff asserting "claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what each defendant did to violate the asserted constitutional right." *Kollaritsch v. Michigan State Univ. Bd. of Trustees*, 944 F.3d 613, 626 (6th Cir. 2019) (quoting *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 899 (6th Cir. 2019)). The plaintiff also must make a clear showing that the defendant was *personally involved* in the activity that forms the basis of the complaint. *See Rizzo v. Goode*, 423 U.S. 362, 377 (1976); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). Moreover, §1983 liability cannot be premised upon mere allegations of *respondeat superior*, *i.e.*, supervisory liability; rather, a defendant can only be liable under §1983 if the plaintiff shows that he personally participated in, or otherwise authorized, approved, or knowingly acquiesced in, the allegedly unconstitutional conduct. *See Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Bellamy*, 729 F.2d at 421.

Here, Coleman has met this standard only with respect to Defendant Mohlman. Coleman alleges that on April 25, 2019, Mohlman "rushed" upon Coleman and Dickson, and told Dickson, "you are not allowed to speak with [Coleman]." (ECF No. 23, PageID.337.) Coleman immediately protested to Mohlman. (*Id.*) This adds at least some factually plausible basis for Coleman's assertion that Mohlman was involved in asking for the block of Coleman's Jpay communications with Dickson.

As to all of the other Defendants, however, Coleman offers only speculation of a "conspiracy." Indeed, in one of the documents Coleman provided to the Court, Coleman wrote, "My gut feeling is that Cindy [Olmstead], or her daughter [Defendant Mohlman], spoke to [the Warden] of the exchange I had with [Mohlman] on the 25th and had him issue the block to prevent us from talking further." (ECF No. 23, PageID.380.) In other words, while Coleman alleged facts from which one could reasonably infer that Mohlman had been involved in blocking his communications with Dickson – thereby satisfying the "causal connection" element of his pleading obligations – he admits that he is merely speculating as to the other Defendants' involvement. Such speculation is an insufficient basis on which to predicate a Section 1983 claim. *See League of United Latin Am. Citizens*, 500 F.3d at 527; *Twombly*, 550 U.S. at 555-56.

For all of the above reasons, all Defendants other than Mohlman are entitled to dismissal with respect to this claim.

### iii.    *Defendants' Qualified Immunity Claim*

Finally, in addition to their other arguments discussed above, Defendants argue that the Court should find that they are entitled to qualified immunity because all allegations against them involve "discretionary functions." (ECF No. 13, PageID.65.) As the Court has recommended

dismissing all claims against all Defendants except for Coleman's "Jpay block" claim against Mohlman, the Court will limit its qualified immunity analysis to that specific claim.

"Government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   To determine whether a government official is entitled to qualified immunity, the court must ask two questions: (1) "taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right?"  (2) Is the right clearly established?"  *Maben v. Thelen*, 887 F.3d 252, 269 (6th Cir. 2018). A right is clearly established to the extent a reasonable person in the defendant's position would know that the conduct complained of was unlawful.  *Saucier v. Katz*, 533 U.S. 194, 202 (2001). Plaintiff bears the burden of showing that the defendant is not entitled to qualified immunity. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).

The Sixth Circuit has recognized that "if a prison officer retaliated against [a prisoner] for filing grievances, the alleged conduct also comprises a violation of clearly established constitutional law." *Maben*, 887 F.3d at 269 (citing *Noble v. Schmitt*, 87 F.3d 157, 162 (6th Cir. 1996)) (internal citations omitted).

Mohlman argues that because Coleman has not asserted facts that support a constitutional violation, she is entitled to qualified immunity for carrying out her "discretionary functions."  (ECF No. 13, PageID.65.)   However, the Court explained above why Coleman's allegations about Mohlman instructing the MDOC to block his communications with reporter Dickson would violate his constitutional rights.   Accordingly, this aspect of Mohlman's qualified immunity argument lacks merit.

Mohlman also argues that "[n]o prisoner work station at MBTF has internet access and MDOC has exclusive authority over prisoner access to the internet, email and Jpay. [] If Plaintiff's access to Jpay/email ceased, it was an MDOC action, not MBTF." (ECF No. 19, PageID.326.) These arguments are factual in nature and not appropriate for a motion to dismiss. Moreover, even if the Jpay block could only be executed by an MDOC official, Coleman has specifically alleged that Mohlman actively participated in that block by requesting that it be applied. At least at the motion to dismiss stage, such allegation is sufficient to overcome Mohlman's argument.

Finally, Mohlman argues that blocking Coleman's Jpay access does not rise to a level of "retaliatory" action, "where no constitutional claim or right exists for Jpay/email access." (ECF No. 19, PageID.326.) But, this applies too narrow a view of Coleman's claim. More is at stake here than just a prisoner's use of Jpay or e-mail; as explained above, Coleman alleges that Mohlman specifically sought to prevent him from communicating with a newspaper reporter about matters the reporter was investigating related to the MBTF. For the reasons stated above, Mohlman's argument lacks merit.

## III.   CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Defendants' Motion to Dismiss (**ECF No. 13**) be **GRANTED IN PART AND DENIED IN PART**. Specifically, all of Coleman's claims should be dismissed, except that his claim against Mohlman regarding the block of his Jpay correspondence with Detroit News reporter Dickson should survive Defendants' motion.

Dated: August 24, 2020                                    s/David R. Grand
Ann Arbor, Michigan                                       DAVID R. GRAND
                                                          United States Magistrate Judge

## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.  A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 24, 2020.

s/Eddrey O. Butts_____
EDDREY O. BUTTS
Case Manager
